United States v. Lopez Mr. Hollins Your Honors, and may it please the Court, my name is Wyatt Hauntz. My co-counsel Patrick Simonitis and I are student attorneys with Northwestern University's Bloom Legal Clinic. At trial, the central issue in this case was whether Mr. Lopez had the intent to defraud his client investors. Perhaps recognizing that its case with respect to intent was at least comparatively weak, the government sought to fill the gaps with plainly inadmissible evidence and argument. For whatever reason, the trial court sloppily allowed the government to do so. Now, on appeal, having all but conceded the legal errors we've identified, the government falls back on the mantra of overwhelming evidence. Repeating that mantra does nothing to meet the government's burden of showing how these errors were harmless. Indeed, to bless any number of fundamental errors under the banner or under the refrain of overwhelming would be to gut Mr. Lopez of his right to due process in a fair trial. In truth, Mr. Lopez was denied his right to fully voice his theory of the case, and the government was given free reign to inject the case with prejudicial and improper evidence and argument. Turning to the errors we've identified, on two occasions the government basically flouted pretrial rulings. First, with respect to the lulling payment testimony of IRS agent Janet DeLancey, and second, when the government twice equated Mr. Lopez to Bernie Madoff during closing argument. Doing so was at best a bad faith parsing of those pretrial rulings. Did the district judge think so? No, Your Honor. The district judge overruled the objections both with respect to the lulling payments and Bernie Madoff. It was wrong to do so on both counts. But do you think she misinterpreted her own orders? Your Honor, it's not that she necessarily misinterpreted her own orders, but rather in both cases she didn't recognize that, for example, in the case of the lulling payments, that there is no principal distinction between the term appearing in the summary documents and the term coming out of Agent DeLancey's mouth. Well, you've got two separate arguments in essence. One is that the district judge mistakenly failed to adhere to her own orders. Yes, Your Honor. She doesn't think so. That's right, Your Honor. You've got a separate argument about whether the underlying conduct was erroneous, okay? And if the district judge doesn't think her orders were violated, it's hard for me to say that they were. Right, Your Honor. So we're actually not arguing. We're not claiming that the orders themselves were violated. We're saying that this is a bad faith parsing. Pre-trial orders had limited the scope of what was appropriate evidence and argument in this case. Did you just say bad faith parsing? By on behalf of the prosecutor. Which the district judge rejected, okay? Yes, Your Honor. So why don't you just focus on what actually happened at trial? Gladly, Your Honor. And I'd like to start with the two references to Bernie Madoff at closing because those were the most egregious examples of improper conduct. These were clearly improper statements. And I think in order to understand how they were harmful and how they affected the outcome of the trial, it's important to look at precisely what the prosecutor said. There were two direct attributions or two direct comparisons between Mr. Madoff and Mr. Lopez. The first comparison said, I would suggest to you, you may know about the Bernie Madoff case. Lots of people got investments back. That they got their money back doesn't mean they weren't defrauded. What that's doing is it's essentially asking the jury not to look at the specific conduct that the evidence showed. It's not asking them to try to compare what the evidence said with respect to each of the 20 counts of conviction, but rather simply asked the jury to assign or ascribe the same problematic and fraudulent intent that the most notorious fraud perpetrator in history had to Mr. Lopez. The second reference was even more troubling. Would you compare Madoff to Ponzi? No, Your Honor. It was, excuse me, I guess I don't understand. Would you compare those two, leaving your client out altogether. Ponzi's scheme and the Madoff's scheme were fairly well akin, were they not? They were fairly well what, Your Honor? Akin. It may be that Mr. Madoff did partake in a Ponzi scheme, but that was completely irrelevant to Mr. Lopez. Well, no, it's not irrelevant because Ponzi is entered into the American lexicon. That may be true. People talk about Ponzi schemes constantly in argument as well as discussion. What's the difference? The difference between... Ponzi and Madoff. So, Your Honor, it was improper, the comparison was improper because there was no evidence on the record at all about what Mr. Madoff did. There was no evidence. There's no evidence in the record what Ponzi did. What if they said it was a Ponzi scheme? Your Honor, it would have also been inappropriate. We would likely claim that it would be inappropriate because the pretrial ruling also covered that. But the second reference to Madoff was even worse because what it did was it drew upon the lulling payment testimony of IRS agent Janet Delancey, and it used that as a way to equate the conduct of Mr. Lopez to the conduct of Mr. Madoff, basically compounding the error. Again, I want to just quickly read what the prosecutor actually said. You heard Agent Delancey talk over and over about the lulling payment. It's designed to mislead. These are not interest payments. Interest payments clearly connote that some sort of return on capital. Just like, again, Bernie Madoff paid people for 15, 20 years or more, hundreds of thousands of people got paid back, doesn't mean they were getting interest on their capital or returns on their capital. So what, again, what he's doing, what the prosecutor there is doing is, you know, compounding the effect of both the lulling payment testimony, which was itself improper, which I'll get to in a moment, and saying Mr. Lopez is just like Mr. Madoff, the most notorious fraudster in history. And was there any evidence that Lopez was earning interest in using it to make those payments? Your Honor, whether he was or was not, he was making the payments up through the middle of 2012. Was he making them with earnings on investments or with new principal, which was the topic of the testimony? Sir, Your Honor, it's actually not clear from the record to my memory what it was, but that actually goes to an important conflation that I think that the prosecution made. They conflated return on investments with interest, and they're not, they're categorically not the same thing. Interest is just a fee paid for the purpose of borrowing money. And to adopt the government's definition of lulling payments would be grossly overbroad. It would cover conduct by, you know, businesses that aren't engaged in any kind of fraudulent conduct all the time. And so I want to turn to that lulling payment testimony and quickly just talk about how it was problematic. The trial court recognized before trial that the term lulling was argumentative and potentially prejudicial if it appeared on summary documents. There is no distinction between that term showing up on summary documents and that term coming out of Agent DeLancey's mouth and 17 times directly attributing that conduct to Mr. Lopez. The term is problematic because it inherently implies a fraudulent intent. It implies what? Excuse me, Your Honor? It implies what? It implies a fraudulent intent. Surely it didn't surprise the jury that the case agent thought that the defendant was guilty. Well, Your Honor, it may not have surprised the jury, but it was still improper for the case agent to do that because doing so, again, whether a lay or expert testimony, was improper. And it was so because, among other things, it required her to basically make a credibility determination of the other witnesses. When asked why she called these particular withdrawals and payments lulling payments, she said, in these types of fraud prosecutions, what you're looking for is to see whether the investor did with the money what he told the clients he would do. In order to determine that he was actually lulling, that these 17 times were actually lulling payments, she thus had to believe what the witnesses, the other witnesses who testified, had said he was going to do with the money. And she had no personal knowledge. She was not qualified to do that. And second, as the Second Circuit and SCOP has recognized, and this court too has recognized, that type of credibility assessment by one witness of others is improper and is squarely the province of the jury. The duty of the jury, it's the duty of the jury to recognize the credibility of the witnesses. I see that I'm going into my rebuttal time, so I just quickly want to turn to the other two issues that we identified. First, it was also erroneous for the trial court to preclude the defense's witness, Michael Allarding, to testify as an expert. Doing so would have allowed. Yes, Your Honor. What evidence was the defense not allowed to put on, and what offer of proof was made about it? Yes, Your Honor. Your first question, there were three expert opinions that Mr. Allarding reached with respect to me, and we list them in our brief with respect to the fact that this was a legitimate, closely held, family-owned business enterprise. This is the wife's business? This is the wife's business where the money was invested. Those three opinions did not come out in full at trial. I heard one. Oh, excuse me. It was that it was a family-owned, closely held business, that Lopez ran nonprofit businesses that have economic substance and have generated significant revenues, and that Lopez's investment company was a profitable business that had the potential to generate a viable and consistent revenue stream. So those are the three opinions. And while there was technically no offer of proof, the expert report, we would allege, was sufficient to satisfy the offer of proof. Moving just quickly. Who was the person who didn't sign his name on some document? Oh, so I believe you may be referring to one of the investors, Danny Cole. And there was a question, and actually that does bring me to the last issue, which was that there was an issue where he had initially authorized Mr. Lopez to sign the documents, and it came out on the stand during trial that when the investigation had began, he did not inform the investigators that he had actually initially authorized those signatures. He said, basically, you know, that's not my signature. And so it was also erroneous for the trial court to preclude the defense from allowing them, the defense, to call Agent Jeremy Shivers to complete the impeachment of Danny Cole on the inconsistent statement that he made. You mean to show that he had authorized him? To show that when the investigation began, he did not reveal to the investigators. That he had authorized him. Exactly. Yes, sir. We've said that that sort of thing is an error in a few cases. Have we ever found it to be reversible? To my knowledge, I can't recall, Your Honor. But I do know that the court has recognized in Lashman and Wembley. Well, you're not relying on that as your case. That's just one of several elements, right? It's true, Your Honor. It's really the only thing in the case. Well, Your Honor, our position is that each one of these errors is reversible on its own, but of course the court should look at the effect of all four when making its decisions. So, if there are no further questions, I reserve the remainder of my time for rebuttal and we ask for a new trial. Thank you. Okay. Thank you very much, Mr. Hans. Sorry. Mr. Wharton? Good morning, Your Honors. May it please the court. My name is James Wharton. I represent the government here today, as I did before the district court, along with my colleague, Winfield Ong. What I've sensed throughout this appeal process is a claim of some bad faith on the part of the government, which distresses the government very much. I'll leave that there after making that point. But critical to that is this. As Judge Hamilton suggested, there's no evidence that the government intentionally violated any of the pretrial orders of Judge Pratt and, in fact, tried carefully to follow those. These issues are all abuse of discretion. That's the issue. The issue is this term, lulling payments. This borrower who said he'd authorized. I'm ready to deal with those all, Your Honor. Which one would you like me to start with? Whatever you want. Well, the reference to Madoff, extremely improper. Here's the government. That's outrageous. You must do things like that. I understand. I think that's reversible in itself. You don't do things. This guy is not Madoff. Madoff is what, serving 150 years in prison? He was sentenced to 150 years, right? I don't know how many years. Well, he was sentenced to 150 years. He's unlikely to survive the entire period. Yes, sir. Right? Yes. I mean, he's like the biggest fraud in history, or the biggest fraud since Ponzi, right? That's not this guy. As Judge Bally suggested, right. You should not imply that he is a Madoff. Government should not do that. May I respond, Your Honor? The connection that was made, first of all, was not evidence. It was in the closing argument. That's worse. Second of all, it was very... Do you think you can just stand up there, say anything to a jury, to a judge, and then say, well, it's not evidence? I didn't suggest that, Judge. I said there's a distinction between... I compared him to Hitler, but not evidence. It's my personal view. You shouldn't do that. The critical point from the government's perspective is this. There were only two references... Only two references.  I'm going to try to answer your question, Judge. I'm trying to. The point is there was... These are referring to specific conduct. This was not some global comparison. He's as bad as Madoff. He is Madoff. Jaime Lopez used loaning payments. I'm going to come back to that more. But contrary to what counsel earlier said, there is no dispute about the fact that these payments that purported to be interest were not made based upon investments. It was a Ponzi scheme. They were made from later investors' money. There is absolutely no dispute in the evidence, and importantly as to the issue about loaning payments, the agent looked at every single transaction... But that doesn't make him Madoff. Madoff did the exact same thing. No, Madoff is doing something entirely different on an enormous scale. We didn't talk about... Oh, come on. Everybody knows that Madoff is the biggest fraud in recent history. May I ask a question, Your Honor? The question was, was the scheme like the one produced by Madoff? Is that the reference you're talking about? The short answer is, I mean, obviously... Oh, I like it. Much, much huger by Madoff. It was similar. But that's not what we said. The point is what we said was that there was a similarity in this one specific act. And why did you say that? I did say that. Why did you say that? You tell me why you referred to Madoff. I have not completed my questioning. Because Madoff claimed innocence, and yet on the same basis, that he had made these payments. And we were making the connection that the fact that she made these loaning payments doesn't take away your criminal intent. So we wanted the jury to understand that. It's beyond my comprehension that the jury convicted Jaime Lopez because in closing argument there was this very limited short reference. So why'd you say it if you don't think it would influence the jury? I didn't say it wouldn't influence. We were trying to make a comparison, Judge. Well, that's trying to influence the jury. Well, closing argument's purpose is to influence the jury. Yeah, so you can lie all you want in closing arguments. I didn't say that, Judge, and we didn't lie. Well, you did lie. We made a connection. You made a connection that doesn't exist, in my opinion. Anyway, I won't interrupt you. I'll go on about the loaning payments. The first important point is these were loaning payments. The evidence was uncontroverted, because it couldn't be controverted, that the quote-unquote purported interest payments made by Lopez were not made by investments because he never made any investments. Appellant counsel talked about investing in his wife's business. He didn't invest any money in his wife's business. He transferred money to his wife's business, and then he spent it to pay their mortgage. Now, loaning payment, what do you mean by loaning? What's that term? I've never seen that before. What's a loaning payment? Well, this court has used that term in other appellate courts. I cited the cases in our brief. But a loaning payment is to sort of take the impact, is to take an investor off guard. And there was testimony by the victims about this, where per the contractual agreement, the terms, interest was, of course, to be made on a regular basis on the investment. But to pay interest, you have to have a return on investment, which since the defendant never invested any of the money, he had to take other money from other investors and book that on their records as if he was paying them interest. So it lulls them. It causes them to believe, in fact, the defendant is honoring his contract. It's a term that this court has accepted. It's a term that other appellate courts have accepted. And Judge Pratt made the point that she had researched it and thought it was a proper term. The other major problem here is the detailed explanation about loaning payment came in response to a question on cross-examination. Trial defense counsel asked the agent, clearly too importantly, she was an 1006 summary witness, the government has the right to summarize the evidence and put it in character. The government doesn't have to, it can't present its evidence in a neutral fashion. The government has the burden of proof in a criminal case, of course. And so the agent had looked at all these documents and then testified about what she had observed. Then defense counsel on cross said, well, what did you mean by loaning payments? Why don't you call them that? And he tried to get her to recast her testimony because he focused on the fact that the contracts, the agreement, required him to pay interest, which of course they did. But she said, well, yes, that's true. Yes, he had to pay interest, but he didn't pay it in the way you're supposed to pay it, which is return on investment. He paid it out of essentially a Ponzi scheme, money coming, we didn't use that term in the trial, but later money from other investors that was used. And they don't like the answer, but it's the truth, and they have to live with the answer because they asked the question. So much of the loaning payment discussion came from questions on cross as opposed to on direct. What about the reference to the person who didn't sign his name? Danny Cole. But had authorized the transaction? Here's what happened. Danny Cole, prior to trial, so not an under oath statement or anything like that, but when he spoke to the agents originally, he told them I didn't sign these documents, which was the truth, uncontroverted. What he didn't tell them, and this is clearly an omission, what he didn't tell them was, but I had, you know, at least acquiesced in letting Lopez sign these for me because at the time I trusted him and I wanted to expedite the process. Should he have told the agent that? Of course, he didn't. But at the trial on direct, this wasn't contradicted by direct versus cross, at the trial on direct, he said, I didn't sign those documents, but I gave him my permission to do that. So that was brought up. Then on cross, the defense hammered him about that. He thought, well, why didn't you say this? And they characterized it as claiming it was a forgery, which he never said it was a forgery. He just said, I didn't sign it myself. So there was no inconsistency between direct and cross. Now, the most important thing here is, in terms of this, you know, discretion about letting them call the other witness, they made all the point they wanted to make about his credibility on cross, and in closing argument, twice they called him a liar. They called Danny Cole a liar to the jury and said he has no credibility because of this. So the point that they wanted to make about this issue, they were able to clearly make. What did the government say? I'm sorry? What did the government say? At the trial? I mean, we objected to them calling the agent before we had taken the statement, saying that the agent couldn't add anything to this. It was an omission. You know, it wasn't like he admitted he lied to the agent. It was a situation where it was going to come, you know, not necessary for the defense to make that point. And, in fact, there's a suggestion in their brief that he could have talked about all these other things, you know, about this statement, which the government's position is clearly would not have been. Well, I don't understand. What, if anything, did the government say about this witness? About, in terms of our analysis of his credibility? I'm not sure I understand your question. Okay, he stated he'd authorized this, but he hadn't signed it. Right. So what was, that was what he said. What did the government say? Well, the most important thing the government said is, this isn't a forgery trial. I'm sorry, what? This was not a forgery trial. What did the government say, please? What I'm trying to tell you, Judge, is that we said the focus is, was this witness defrauded by the false pretenses, representations, and promises? So whether or not he acquiesced in signing that document doesn't answer that question. The defendant had lied, had misled the investors, and whether or not he gave them permission to sign that document doesn't answer that question. What did the government say about the permission? The government said about the omission that it was not critical to understanding the elements of the offense, and that his credibility otherwise was in place, based upon all the other evidence. So you acknowledge that he had authorized the transaction? Absolutely. Pardon? Absolutely, yes. He did, okay. He did authorize it. There's no question about that. But critical to remember also, Judge, is with respect to that victim and the other three victims, the defendant later completely falsified a whole set of documents to change the terms more beneficial to him. He lowered the interest rate. He extended the time of the payment requirements of his. And everyone testified, and it was completely not disputed, that the defendant had created all these false documents later that were critical to showing his criminal intent. How much money did he obtain from this program? About $400,000. Most of it spent on all kinds of personal. Most of it what? Spent on his home mortgage. He bought two Mercedes cars. He spent $30-some-thousand on landscaping for his house. It was all spent essentially on his lifestyle. $45,000 he put on an E-Trade account, and he lost every penny of that. But no other money was invested at all. The money to his wife's business was not an investment. Let me talk last, unless there are any questions, about the issue with Mr. Allerding, their supposed expert witness. Critical, first of all, is the fact that Judge Pratt has a practice that she doesn't label witnesses as experts, even if they are. That's just her practice, and it's a common practice in our district to not do that. I'm certainly familiar with that practice. I know Judge Hamilton is very familiar with that practice. In fact, the government does agree with it, but even if it didn't agree with it, that's the standing order, and everybody involved in the trial knew about that ahead of time. The bottom line about Allerding is this, and I think Judge Hamilton suggested this in his questions a while ago. They got in all the evidence they wanted to get in that was admissible anyway, and then, in fact, Judge Pratt gave the jury the expert instruction at the end over the government's objection. But the jury got the expert instruction. He was allowed to give all kinds of opinions. The government's major objection really wasn't the 702 issue, although the evidence he gave didn't require 702 status. The government's objection was primarily on relevance, initially at least on 401, meaning because the evidence had nothing to do with the issues in the case. The fact that his wife's business now, the day of the trial, was profitable and standing well has nothing to do with the fraud charges, and our argument throughout was this is just going to confuse the jury, create issues that are inappropriate for them to even consider. That being said, the district judge still allowed him to create a lot of that testimony, give opinions about how these cases operate. Why didn't the judge allow Allerding to be called an expert witness? Well, for two reasons. The first one is it's her standard practice, and this is referenced in the pleadings. It's Judge Pratt and, in fact, our district standard practice generally not to label witnesses with that title as if it gives them too much. Why? It gives them my understanding. Why don't I explain that since that was my practice? Judge Hamilton can answer the question better than me. My thinking when I followed that practice was that when counsel turned to the judge and say, in essence, I would like you to label my witness as a, quote, expert, that the judge's application of that label can be understood as endorsing and crediting that testimony. Now, there are different points of view, and it's not a perfect solution to the problem, but it's a common solution to the problem. I don't know what time is up, so I'll say one sentence. What's critical to this is he got to give opinion testimony anyway. She gave the jury the instruction for experts, and anything else they've proffered that he wasn't allowed to testify to is clearly a mistake. Did you have an expert witness? We did not have an expert witness. We had a 1006 summary witness, and we repeatedly took the position that she was not an expert, and she wasn't. She was a summary witness. Thank you. Okay, well, thank you very much, Mr. Wood. Mr. Hans or Simonides? Yeah, Mr. Simonides. Thank you, Your Honor. May it please the Court, Patrick Simonides, continuing argument for Mr. Lopez. Your Honor, I'd like to make three quick points on rebuttal. First, we're not meaning to impugn the government or the district court with respect to the arguments we're making. We're trying to point out that these errors in the trial essentially created an uneven playing field for Mr. Lopez. Second, with respect to what the government now says about lulling payments, first of all, it's not a term of art. When courts have used this term, it's been in opinions essentially describing fraudulent conduct. There's no financial term that says lulling is some sort of neutral. There's no what term? There's no sort of, that I know of, financial definition for this sort of lulling payment. Used in cases. It's used in cases, Your Honor, the same way a court might say that murder in a case, but a witness is not allowed to stand up and say this is murder. With respect to... He's not? I'm sorry, Your Honor. Maybe I'm overstating what I mean. You're lulling us in with such a security, but go ahead. The lulling term essentially is allowing the government or was allowing this witness to make a credibility determination that the government evidence was credible, whereas the defense evidence was not, and then basically attributing this fraudulent intent to Mr. Lopez directly 17 times. And that error was compounded and the prejudice is compounded by the fact that the government then, in closing argument, explicitly tied this improper evidence to Bernie Madoff and said that just like Mr. Lopez, Bernie Madoff used lulling payments. So now not only has the jury 17 times heard this intent attributed to the defendant, now they hear that Bernie Madoff had the same intent and did these same exact actions. With respect to what the government represented about allowing the impeachment of Mr. Cole, the government, the prosecutor at that time said, and this is a blatant misrepresentation of the law to the court, he said he admitted that he made this statement, therefore it's no longer inconsistent. It's no longer what? Inconsistent. And that is at odds with the two cases we cited, Wimberley and Lesch-Mett. And in those cases, although this court did find that they were harmless, those cases, there was other evidence allowed in to essentially show this inconsistency of that witness in that case. And we do discuss that in our briefs. And if there are no further questions, Your Honors, we ask that you reverse and remand for a new trial on all 20 counts. Okay, thank you very much to all of the lawyers. And we'll move on to our next case.